UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| BACILIO A. AMORRORTU, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | CIVIL ACTION NO. 4:06-CV-04012 |
| § | |
| REPUBLIC OF PERU, § | |
| § | |
| Defendant. § | |

### MEMORANDUM AND ORDER

Before the Court is Defendant's Motion to Dismiss the Complaint (Doc. No. 23). The Motion requests dismissal under Federal Rules of Civil Procedure 12 for lack of subject matter jurisdiction, lack of personal jurisdiction, and failure to state a claim; the Motion also argues that the Complaint should be dismissed because it has been filed in an inconvenient forum. After carefully considering the Motion, the responses and replies thereto, and all applicable law, the Court finds that it lacks subject matter jurisdiction under Rule 12(b)(1) and the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. §§ 1602 *et seq.*, and therefore the case must be dismissed.

I.   BACKGROUND

*Pro se* Plaintiff Bacilio A. Amorrortu ("Amorrortu") files this lawsuit against Defendant Republic of Peru making the following claims:  "Political Persecution," "Confiscation of Assets and Loss of Opportunities," "Misconduct and Negligence," "Pain and Suffering," and "Economical Torture." (Compl., Doc. No. 1, at 9-11.) In total, Plaintiff seeks to recover $37 million, plus costs, for his alleged injuries. (Compl. Doc.

No. 1, at 11.) According to his Complaint, the factual bases for these allegations are as follows.

### 1. Non-payment of Debts

Since at least 1992, Propetsa, an oil company, has allegedly been owed a debt of six million dollars (US) by PetroPeru, another oil company. (Compl., Doc. No. 1, at 3.) Amorrortu, writing in the third person, describes Propetsa as having been "his oil company" at the times the alleged debt accrued and came due, and he describes PetroPeru as having been "the Peruvian State oil company" at those times. (Compl., Doc. No. 1, at 3.) The origins of this debt are not clearly explained in the Complaint. Amorrortu alleges that the "Peruvian State Comptrollership," apparently a Peruvian auditing authority, acknowledged this debt on behalf of the Republic of Peru on June 5, 1992 when it issued a "Special Analysis." (Compl., Doc. No. 1, at 4.) Nonetheless, Defendant Republic of Peru, which Amorrortu alleges was responsible for this debt, has not paid Propetsa this money. (Compl., Doc. No. 1, at 4.) Amorrortu describes this non-payment as "a confiscation act," (Compl., Doc. No. 1, at 3-4), and alleges that its result was that Propetsa was unable to "participate in the purchase of profitable PetroPeru units under a privatization process in the period of 1992 to 1996." (Compl., Doc. No. 1, at 4.) In 1995, Amorrortu alleges, he unsuccessfully sought redress on behalf of Propetsa in Peruvian courts by filing a lawsuit for forty million dollars (U.S.) against PetroPeru. (Compl., Doc. No. 1, at 4.) According to the Complaint, Amorrortu did not prevail in his case, but he attributes the negative result of his case to the shortcomings of the "corrupt" and "inefficient" Peruvian judiciary. (Compl., Doc. No. 1, at 4, citation omitted.)[1]

---

[1] As further evidence of the inadequacy of the Peruvian judiciary, Amorrortu notes that, when he was allegedly "unlawfully fired from Propetsa's Chairman chair" in 1999, he again turned to the Peruvian

Also in 1995, Amorrortu, acting as President and CEO of Propetsa, allegedly signed an agreement with Swiss Bank Corporation ("SBC") under the law of New York relating to PetroPeru's debt. (Compl., Doc. No. 1, at 4-5.) According to the Complaint, the agreement was effected under "The Peruvian Brady Plan," which "permitted . . . the Peruvian State to solve [sic] and pay claims to private companies," and it provided for SBC to "assume[] 'the Claims' to pay to Propetsa [sic]." (Compl., Doc. No. 1, at 4-5.) The Court is not entirely clear about the meaning of these allegations, but its best interpretation is that Amorrortu, on behalf of Propetsa, sold his right to receive the six million dollars from the Republic of Peru to SBC. According to the Complaint, "months later," an "SBC banker told Amorrortu that the Peruvian State did not want SBC to pay Propetsa due political reasons [sic]." (Compl., Doc. No. 1, at 5.) Amorrortu alleges that he responded by asking SBC to "pull out from Peru his expensive oil rigs to be moved to Houston, Texas," apparently because he was afraid they would be confiscated. (Compl., Doc. No. 1, at 5.) In December of 1996, SBC allegedly responded by unilaterally terminating the agreement over Amorrortu's objections. (Compl., Doc. No. 1, at 5). Subsequently, on March 21, 1999, Amorrortu alleges that an article "appeared in the main Peruvian newspaper a public Peruvian State advertising disclosing [sic] that SBC was a solely Peruvian State agent during the Peruvian Brady Plans negotiations during the period of time 1994-1997." (Compl., Doc. No. 1, at 5.)[2]

---

courts for redress, but was similarly unsuccessful. (Compl., Doc. No. 1, at 4.) By way of explanation, he states, "The Peruvian Judiciary is corrupt. In Peru there is not Justice." (Compl., Doc. No. 1, at 4.)

[2] In its analysis of the Republic of Peru's immunity under the FSIA, the Court will address Amorrortu's complaints regarding his alleged contract with SBC in New York. The Court notes, however, that if this case were in its jurisdiction, the Court would undoubtedly find that Amorrortu's claims under New York law are time-barred. *See* N.Y. C.P.L.R. § 213(2) (six-year statute of limitations for breach of a written contract); N.Y. C.P.L.R. § 214(4) (three-year statute of limitations for an action to recover damages for an injury to property); N.Y. C.P.L.R. § 214(5) (relating to late-discovered causes of injury); *see also Fury*

According to the Complaint, Amorrortu's concern that Propetsa's assets would be confiscated came to fruition, although the Complaint is unclear about the timeline of confiscation. (Compl., Doc. No. 1, at 5-6.) Propetsa was allegedly "shut[] down completely in 1996," and from 1999 to 2006, he alleges, the Republic of Peru sold the confiscated assets, including oil rigs and oil equipment. (Compl., Doc. No. 1, at 6.) He further alleges that, in 2005, the Republic of Peru "executed or permitted the demolition of the expensive 3 acre Propetsa's Shop-Plant." (Compl., Doc. No. 1, at 6.) It bears mention that Amorrortu's complaint alleges that he was "unlawfully fired from Propetsa's Chairman chair" in 1999 (Compl., Doc. No. 1, at 4), after which time Amorrortu alleges that he remained a shareholder with a 26% stake in the company. (Compl., Doc. No. 1, at 9). Amorrortu's lawsuit, however, is brought solely in his individual capacity. (Compl., Doc. No. 1, at 1.)

2.   **Political Persecution**

Amorrortu also bases his claims on the alleged political persecution he has suffered as a result of his activities as the leader of a political party in Peru, "En Accion." (Compl., Doc. No. 1, at 6.) He claims that his efforts to run for the presidency of Peru were thwarted in 1992, when his petition to join the race was allegedly rejected by the state and on appeal by the Organization of American States, and again in 1994, although the circumstances of these latter efforts are unclear from the Complaint. (Compl., Doc. No. 1, at 6-7.) Amorrortu further alleges that the Peruvian government "implemented a cruel plan of economical [sic] deterioration" that prevented him from earning income or finding work. (Compl., Doc. No. 1, at 6-7.) The Complaint does not offer any further

---

*Imports, Inc. v. Shakespeare Co.*, 625 F.2d 585, 587 (5th Cir. 1980) (applying New York law to find a three-year statute of limitations for claims of tortious interference with a contract, citing, *inter alia*, N.Y. C.P.L.R. § 214(4)), *cert. denied*, 450 U.S. 921 (1981).

details about how the Republic of Peru did so. It is notable, however, that according to the Complaint, Amorrortu alleges that he is now a political asylee in the United States. (Compl., Doc. No. 1, at 1.)

## II. LEGAL STANDARDS

Federal Rule of Civil Procedure 12(b)(1) governs challenges to a court's subject-matter jurisdiction. "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison,* 143 F.3d 1006, 1010 (5th Cir. 1998) (quotation omitted). "Courts may dismiss for lack of subject matter jurisdiction on any one of three bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Clark v. Tarrant County,* 798 F.2d 736, 741 (5th Cir. 1986) (citing *Williamson v. Tucker,* 645 F.2d 404, 413 (5th Cir. 1981)). The plaintiff bears the burden of demonstrating that subject-matter jurisdiction exists. *See Paterson v. Weinberger,* 644 F.2d 521, 523 (5th Cir. 1981).

The FSIA provides the sole source of subject matter jurisdiction in suits against a foreign state. *Dale v. Colagiovanni,* 443 F.3d 425, 427-28 (5th Cir. 2006) (*citing Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 434-39 (1989)). "'The general rule under the FSIA is that foreign states are immune from the jurisdiction of the United States Courts.'" *Id.* at 428 (*quoting Byrd v. Corporacion Forestal y Industrial De Olancho S.A.,* 182 F.3d 380, 388 (5th Cir. 1999)). "'However, a district court can exercise subject matter jurisdiction over a foreign state if one of the statute's

exceptions apply.'" *Id.* (*quoting Byrd*, 182 F.3d at 388). Moreover, the Court must begin with a presumption of immunity from suit, *Permanent Mission of India v. City of N.Y.*, 127 S. Ct. 2352, 2355 (2007) ("Under the FSIA, a foreign state is presumptively immune from suit unless a specific exception applies."); while the party claiming immunity carries the ultimate burden of persuasion to show immunity, once it makes a prima facie showing of immunity, the burden shifts to the plaintiff to show that one of the exceptions to immunity exists. *United States v. Moats*, 961 F.2d 1198, 1205 (5th Cir. 1992).

### III. ANALYSIS

There is no dispute in this case that Defendant Republic of Peru is a foreign sovereign and thus enjoys general immunity under the FSIA. The question in establishing the Court's subject matter jurisdiction is therefore whether one of the FSIA's exceptions to general immunity applies in this case. For the reasons that follow, the Court finds that none of the four exceptions relevant to this case applies, and consequently, the Court lacks subject matter jurisdiction to hear the lawsuit.

#### A. The Waiver Exception

Section 1605(a)(1) of the FSIA sets forth the "waiver" exception to sovereign immunity:

> **(a)** A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
> **(1)** in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver . . . .

28 U.S.C. § 1605(a)(1). There is no implication whatsoever that the Republic of Peru has waived its sovereign immunity in this case;[3] in fact, it has explicitly objected to the Court's jurisdiction in every filing it has made to date. Moreover, that the Republic of Peru has actively taken part in the litigation by requesting extensions and filing this Motion is insufficient to establish a waiver. *See Ex Parte Republic of Peru*, 318 U.S. 578, 589 (1943).

### B. The Commercial Activity Exception

Section 1605(a)(2) of the FSIA sets forth the "commercial activity" exception to sovereign immunity:

> **(a)** A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
> . . .
> **(2)** in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States . . . .

28 U.S.C. § 1605(a)(2). In interpreting this exception, the Fifth Circuit has held, "Foreign sovereigns are not immune from judicial process in actions based upon commercial activity that has a jurisdictional nexus with the United States, as defined by the FSIA." *Can-Am Intn'l v. Republic of Trinidad and Tobago*, 169 Fed. App'x 396, 404 (5th Cir. 2006), *cert. denied* 127 S. Ct. 189 (2006) (*citing Stena Rederi AB v. Comision*

---

[3] The case cited in Amorrortu's Response (Doc. No. 29, at p. 17), *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699 (9th Cir. 1992), is not to the contrary. That case found an implied waiver of sovereign immunity where the foreign sovereign had previously brought a related lawsuit in a the United States, thereby availing itself of the U.S. court system. *Id.* at 720. The *Siderman* court also noted that the foreign sovereign "did not controvert the [plaintiff's] implicit waiver argument in the district court," and that "the only material before us on the subject of waiver is that presented by the [plaintiff]," and that, "[o]n remand, [the foreign sovereign] will have an opportunity to rebut the [plaintiff's] evidence." *Id.* None of these circumstances apply to the instant lawsuit. Moreover, *Siderman* is a Ninth Circuit case and is not binding on the Court.

*de Contratos del Comite Ejecutivo General del Sindicato Revolucionario de Trabajadores Petroleros de la Republica Mexicana S.C.,* 923 F.2d 380, 386 (5th Cir. 1991)). The Fifth Circuit explained:

> In order to decide whether the commercial activity exception applies, first, the relevant activity must be identified. "This requires focusing on the acts of the named defendant, not on other acts that may have had a causal connection with the suit. In particular, we must isolate those specific acts of the named defendant that form the basis of the plaintiff's suit." *de Sanchez v. Banco Central de Nicaragua,* 770 F.2d 1385, 1391 (5th Cir. 1985) (citation omitted).
>
> Second, the court must determine if the relevant activity is sovereign or commercial. The statutory definition of "commercial activity" is "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). The second sentence of § 1603(d) directs the courts to look at the "nature" of an activity rather than its "purpose" in determining whether it is commercial. Thus, the Supreme Court has defined an activity as having a commercial nature for purposes of FSIA immunity if it is of a type that a private person would customarily engage in for profit. [*Republic of Argentina v. Weltover,* 504 U.S. 607, 614 (1992)]; *Callejo v. Bancomer, S.A.,* 764 F.2d 1101, 1108 n.6 (5th Cir. 1985). A foreign government's acts may be deemed commercial when that foreign government is not acting "as a regulator of the market, but in the manner of a private player within it." *Weltover,* 504 U.S. at 614, 112 S. Ct. 2160.
>
> Finally, if the relevant activity is commercial in nature, the court must determine whether it had the requisite jurisdictional nexus with the United States.
>
> . . .
>
> *Stena* further states, "[n]ot only must there be a jurisdictional nexus between the United States and the commercial acts of the foreign sovereign, there must be a connection between the plaintiff's cause of action and the commercial acts of the foreign sovereign." [*Stena,* 923 F.2d at 386.]

*Id.* at 404-05 (footnotes omitted).

The relevant activities of the Republic of Peru are those that give rise to Amorrortu's claims, namely, the Republic of Peru's non-payment of PetroPeru's alleged

debt to Propetsa, its alleged confiscation and destruction of Propetsa's assets, and its alleged political persecution of Amorrortu.[4]

As a preliminary matter, the Court notes that the alleged political persecution of Amorrortu, which Amorrortu describes as involving ballot exclusion and a plan to deprive Amorrortu of a job and income, is not commercial activity. It is neither a regular course of commercial conduct or a particular commercial transaction or act, and no private person would engage in these kinds of activities for profit. Even though these allegations, if true, would amount to an injustice of the highest order, it is clearly the injustice of a sovereign and therefore outside the scope of the commercial activity exception. *See Saudi Arabia v. Nelson*, 507 U.S. 349, 362 (1993) ("[A] denial of justice . . . cannot be performed by an individual acting in his own name. [It] can be performed only by the state acting as such.").

As to Amorrortu's complaints of confiscation and destruction of Propetsa's assets and the non-payment of debts owed to Propetsa, the Court also finds that Amorrortu has failed to allege facts that satisfy the commercial activity exception to the FSIA. To begin with, confiscation and expropriation are not commercial actions, for they are not actions of a nature that a private person would, or could, engage in for profit. *See, e.g., Rong v. Liaoning Prov. Gov't*, 452 F.3d 883, 889-91 (D.C. Cir. 2006); *United Mexican States v.*

---

[4] As for the allegations that SBC "assume[]" 'the Claims' to pay to Propetsa [sic]" (Compl., Doc. No. 1, at 4-5) and then breached that agreement, the Court notes that this alleged agreement was between Propetsa and SBC, not Amorrortu and the Republic of Peru. SBC is not a defendant in this lawsuit, and Amorrortu has sued neither SBC nor the Republic of Peru for breach of contract. Amorrortu has not pled facts tending to show that SBC was merely the alter ego of the Republic of Peru; a reference to a newspaper article making an ambiguous and unsubstantiated claim that such a relationship exists is simply too speculative a basis upon which to deny the Republic of Peru its sovereign immunity. Moreover, the acts of an agent in the United States cannot be attributed to a foreign sovereign for purposes of sovereign immunity; "it is the acts of the foreign government that determine whether the foreign acts are commercial within the meaning of the FSIA." *Can-Am Int'l*, 169 Fed. App'x at 405-06.

*Ashley*, 556 S.W.2d 784, 786 (Tex. 1977) (*citing Alfred Dunhill of London, Inc. v. Cuba*, 425 U.S. 682, 704 (1976)).

As for the non-payment of debts, the origin of the alleged debt is not clearly explained in the Complaint, making it impossible for the Court to find that Amorrortu has succeeded in establishing the Court's subject matter jurisdiction under the commercial activity exception to the FSIA. It is clear, however, that Amorrortu has failed to demonstrate that this case involves the simple non-payment of a contractual or other commercial debt owed by the Republic of Peru to Amorrortu: by his own admissions, the alleged debt is not owed by the Republic of Peru itself, but by PetroPeru. Even if the Court assumes, as it must for purposes of this motion, that PetroPeru is an oil company wholly-owned by the Republic of Peru, its actions in a commercial market are not attributable to the Republic of Peru itself for purposes of sovereign immunity. *First Nat'l City Bank v. Banco Para El Comercio*, 462 U.S. 611, 626-27 (1983) (hereinafter "*Bancec*") (for purposes of the FSIA, "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such").[5] Amorrortu has not made any factual or other allegation that PetroPeru was the alter ego of the Republic of Peru, nor has he offered allegations showing that a representative of the Republic of Peru directed the actions of PetroPeru. *See Dale*, 443 F.3d at 429 (a plaintiff can overcome the presumption of independence in certain circumstances by showing that "the state exercises day-to-day control over the agency"). Moreover, the Republic of Peru has not attempted to avail itself of United States law to

---

[5] "Although *Bancec*'s description of the basis for disregarding the separate juridical status of foreign agencies occurred in a discussion of substantive liability, its principles have been applied to FSIA jurisdictional issues. *See Foremost-McKesson, Inc. v. The Islamic Republic of Iran*, 905 F.2d 438, 446 (D.C. Cir. 1990); *Hester Int'l Corp. v. Federal Republic of Nigeria*, 879 F.2d 170, 176 (5th Cir. 1989)." *Arriba Ltd. v. Petroleos Mexicanos*, 962 F. 2d 528, 533 (5th Cir. 1992).

effect any similar or related recovery from either Propetsa or Amorrortu, *see Bancec*, 462 U.S. at 633-34 (recognizing "the injustice that would result from permitting a foreign [entity] to reap the benefits of our courts while avoiding the obligations of international law"). In addition, just as the Republic of Peru is not the alleged debtor, Amorrortu is not the alleged creditor: the debt, if any, is owed to Propetsa, not Amorrortu. By his own admission, Amorrortu is no longer the president, chief executive officer, or chairman of Propetsa, he is a shareholder with a 26% stake who is suing in his individual capacity. (Compl., Doc. No. 1, at 9.) Not only do these attenuated relationships between the parties and the actions complained of violate the formal requirement that the suit arise out of the actions of the "named defendant," *Can-Am Int'l*, 169 Fed. App'x at 404, but they preclude a finding that there is a sufficient connection between Amorrortu's cause of action and the commercial acts of the Republic of Peru, *id.* at 405.[6]

### C. The Expropriation Exception

Section 1605(a)(3) of the FSIA sets forth the "expropriation" exception to sovereign immunity:

> **(a)** A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
> . . .
> 
> **(3)** in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign

---

[6] The Court further notes that, with the exception of the alleged agreement between Propetsa and SBC under the laws of New York, an agreement to which Amorrortu admits he was not a party and upon which Amorrortu has brought no breach of contract claim, none of the actions complained of took place in the United States, nor did they have any direct effect in the United States. The Court is unaware of any other nexus to the United States that would be sufficient to establish jurisdiction. *Can-Am Int'l*, 169 Fed. App'x at 404 (*citing Stena*, 923 F.2d at 386).

> state and that agency or instrumentality is engaged in a commercial activity in the United States . . . .

28 U.S.C. § 1605(a)(3).

Therefore, under the expropriation exception to the FSIA, a plaintiff must show that rights in property are in issue, that the property was taken in violation of international law; and that one of the two nexus requirements is satisfied. *Id.; see also Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 251 (2d Cir. 2000). The allegations in the Complaint, when assumed to be true and given the benefit of every reasonable inference, do not suffice to show that this case is within the expropriation exception. As noted above, the Court is not convinced that any rights in property are actually in issue: the rights complained of appear to be those of Propetsa, whereas the complainant is shareholder Amorrortu, proceeding individually. Even if the rights are Amorrortu's to assert, the Complaint does not establish that the rights were "taken": the property in question was allegedly confiscated to satisfy a debt of unknown origin—a debt, it bears mention, that by Amorrortu's own admission was upheld as valid by the (allegedly corrupt) Peruvian courts. Moreover, Amorrortu's allegations are insufficient to support a finding that either of the two nexus requirements is satisfied. The property in question—that which has not been destroyed—is and has always been in Peru, and Amorrortu makes no allegation that the remaining property is owned or operated by an agency or instrumentality of the Republic of Peru that is engaged in a commercial activity in the United States. Based on these allegations, the inferences required to find that Amorrortu has carried his burden to show that the expropriation exception to the FSIA applies cannot reasonably be drawn.

### D. The Non-Commercial Tort Exception

Section 1605(a)(5) of the FSIA sets forth the "non-commercial tort" exception to sovereign immunity:

> **(a)** A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
> . . .
>> **(5)** not otherwise encompassed in paragraph (2) above, in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to—
>>> **(A)** any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or
>>> **(B)** any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights. . . .

28 U.S.C. § 1605(a)(5). On its face, this exception applies only to cases in which the damage or loss of property occurs in the United States. *Id.*; *see also Amerada Hess Shipping Corp.*, 488 U.S. at 439 ("Section 1605(a)(5) is limited by its terms . . . to those cases in which the damage or loss of property occurs in the United States."). According to the Complaint, none of Amorrortu's alleged personal injuries, nor any of the alleged damage to or loss of his property, occurred in the United States.[7] Therefore, the non-commercial torts exception to the FSIA is inapplicable.

---

[7] To the extent that Amorrortu intends to allege that the Republic of Peru interfered with his contract rights in his agreement with SBC in New York, the Court would note that "interference with contract rights" is expressly outside the scope of the non-commercial torts exception. 28 U.S.C. §1605(a)(5)(B).

## IV. CONCLUSION

The Court harbors no doubts that Amorrortu's complaints about his treatment by the Republic of Peru are voiced in earnest, and that his feelings of aggrievement are real. This Court, however, may not act in the absence of jurisdiction, and Amorrortu has not carried his burden of showing that one of the exceptions to the FSIA's grant of sovereign immunity applies. Therefore, Defendant Republic of Peru's Motion to Dismiss the Complaint (Doc. No. 23) is **GRANTED**, and the case is **DISMISSED** for lack of subject matter jurisdiction.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 31st day of July, 2008.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

**TO ENSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS ORDER SHALL FORWARD A COPY OF IT TO EVERY OTHER PARTY AND AFFECTED NON-PARTY EVEN THOUGH THEY MAY HAVE BEEN SENT ONE BY THE COURT.**